IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA, et al.,

        Plaintiffs,

v.                                        CIVIL ACTION NO. 2:18-cv-01175

CSX TRANSPORTATION, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

### I. Introduction

Pending before the court is Plaintiffs' Unopposed Motion to Enter Consent Decree [ECF No. 4]. For the reasons that follow, the Motion is **GRANTED**, and the parties' proposed Consent Decree [ECF No. 3-1] is **ENTERED**.

### II. Background

On February 16, 2015, the defendant's train carrying Bakken crude oil derailed near Mount Carbon, West Virginia, causing twenty-seven railcars to leave the tracks. Many of the railcars erupted in explosions and fires while damage to the remaining railcars caused oil to spill into the Kanawha River and Armstrong Creek. The derailment caused a widespread power outage, shut down a water intake system serving 2,000 people, forced a four-day evacuation of nearby communities, and destroyed a neighboring house. Further, an oily sheen appeared in the Kanawha

River near its confluence with Armstrong Creek for at least two months after the derailment.

Plaintiffs, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of West Virginia ("the State"), on behalf of the West Virginia Department of Environmental Protection ("WVDEP"), filed their Complaint [ECF No. 1] against Defendant CSX Transportation, Inc. ("CSXT") on July 23, 2018. The Complaint alleges that CSXT violated Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(3); Sections 6 and 8 of the West Virginia Water Pollution Control Act ("WPCA"), W. Va. Code §§ 22-11-6 and 8; and Section 4 of the West Virginia Groundwater Protection Act ("WGPA"), W. Va. Code § 22-12-4. Plaintiffs filed the proposed Consent Decree [ECF No. 3-1] on July 24, 2018. The United States subsequently published a notice of the filing of the Consent Decree in the *Federal Register*, informing the public that the Department of Justice would accept comments relating to the proposed Consent Decree for a period of thirty days. On November 19, 2018, Plaintiffs filed the instant Motion, requesting the court enter the proposed Consent Decree as a final order in this matter.

### III.  Legal Standard

A consent decree is a negotiated agreement that "'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." *Szaller v. Am. Nat. Red Cross*, 293 F.3d

2

148, 152 (4th Cir. 2002) (quoting *Smyth v. Rivero*, 282 F.3d 268, 279–80 (4th Cir. 2002)). "Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court." *W. Va. Rivers Coal. v. Appalachian Power Co.*, No. 3:14-24237, 2014 WL 5450239, at *1 (S.D. W. Va. Oct. 23, 2014).

The Fourth Circuit has explained that when considering whether to enter a proposed consent decree, the general principle to be followed is that settlements are encouraged. *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). "The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field . . . EPA is such an agency." *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) (internal citation omitted).

Nonetheless, district courts should not blindly accept the terms of a proposed settlement. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975). Instead, "before entering a consent decree the court must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *North Carolina*, 180 F.3d at 581 (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)). The court must assess the strength of the plaintiffs' case in considering the fairness and adequacy of a proposed settlement. *Id.* Specifically, the court should consider the stage of the proceedings, the extent of

discovery that has taken place, the experience of the plaintiffs' counsel who negotiated the settlement, and the want of collusion in the settlement. *Id.*

IV. Discussion

Plaintiffs submit that the parties negotiated the proposed Consent Decree at arm's length. Plaintiffs also state that the proposed Consent Decree addresses the allegations in the Complaint and advances the purposes of the CWA. Accordingly, Plaintiffs contend that the proposed Consent Decree is fair, adequate, reasonable, and not contrary to the public interest.

The proposed Consent Decree, which resolves only the claims alleged in the Complaint, requires CSXT to: (1) pay a federal civil penalty of $1,200,000; (2) pay a $1,000,000 civil penalty to the State; and (3) perform a State Supplemental Environmental Project ("SEP") worth $500,000. Proposed Consent Decree [ECF No. 3-1] 3–4. The SEP will allow the State to assist the Kanawha Falls Public Service District in carrying out necessary upgrades to its water treatment facilities. *Id.* at 4. The proposed Consent Decree explicitly reserves the resolution of any outstanding claims by the United States or the State for response costs, natural resource damages, and injunctive relief. *Id.* at 11.

### a. Fairness, Reasonableness, and Adequacy

To begin, the court notes that it is difficult to make an initial determination of fairness, reasonableness, and adequacy given that the court is required to examine the agreed settlement through the lens of deference. This is particularly true when,

as in this case, the deference is multifaceted. The court is not only guided by the general principle that settlements are encouraged but must also provide additional deference because the settlement was negotiated by the Department of Justice on behalf of the EPA. Thus, an initial finding of fairness, reasonableness, and adequacy is best left to the parties, and the court will review the proposed Consent Decree only to ensure that it is not unfair, unreasonable, or inadequate.

To this end, the court first finds that the proposed Consent Decree is not unfair. The agreement is the product of approximately eighteen months of arm's length negotiations between the United States, the State, and CSXT. *See* Mot. Enter Consent Decree ("Pls.' Mot.") [ECF No. 4] 8. Throughout the negotiations, the parties were represented by counsel with experience on environmental regulation. *Id.* While the parties have not engaged in formal discovery, resolving the parties' dispute over an appropriate civil penalty required the exchange of technical and forensic information about the spill and its aftermath. *See id.* at 9.

The court next finds that the proposed Consent Decree is not unreasonable or inadequate. In making this finding, however, the court cannot ignore the seriousness of the derailment and resulting oil spill, which caused a widespread power outage affecting thousands of people, created an oily sheen on the Kanawha River for at least two months, and required the evacuation of neighboring communities. In an attempt to hold CSXT accountable for the oil spill, the proposed Consent Decree requires CSXT to pay a civil penalty totaling $2,200,000 and perform a $500,000 SEP.

The Supreme Court has made clear that "all civil penalties have some deterrent effect." *Hudson v. United States*, 522 U.S. 93, 102 (1997). However, there is a question as to whether the penalty in this case is sufficient to deter similar oil spills, given the prevalence of oil-train accidents, the magnitude of the risk involved, and CSXT's history of oil-train derailments.

In recent years, railroads in the United States have begun to transport significantly more oil. In 2015, U.S. railroads carried 40 times more oil than they did in 2005.[1] As shipments of oil by rail have increased, strings of accidents have followed.[2] In 2014, American oil trains spilled crude oil more often than in any year since the federal government began collecting data on such incidents in 1975.[3] Further, while there were fewer accidents in 2013 than in 2014, trains spilled a larger volume of crude oil, totaling 1.4 million gallons—an amount exceeding the total for all spills since record keeping began.[4] Many oil-train derailments have resulted in fires and evacuations, such as the April 30, 2014 derailment of a CSXT crude oil train in Lynchburg, Virginia that caused the discharge of nearly 30,000 gallons of oil into the James River.[5] In short, given the nature and the extensiveness of the

---

[1] Tony Dokoupil, *Oil Train Spills Hit Record Level in 2014*, CBS NEWS (Jan. 26, 2015, 8:48 AM), https://www.nbcnews.com/news/investigations/oil-train-spills-hit-record-level-2014-n293186.
[2] *See id.*; *see also A Timeline of Recent Oil Train Crashes in the US and Canada*, ASSOCIATED PRESS (June 3, 2016), https://www.apnews.com/84b1e8273d854697b34af57bc60badc2 (listing fourteen recent oil-train accidents).
[3] Dokoupil, *supra* note 1.
[4] Joby Warrick, *Trains Are Carrying – and Spilling – a Record Amount of Oil*, WASH. POST (Feb. 17, 2015), https://www.washingtonpost.com/news/energy-environment/wp/2015/02/17/trains-are-carrying-and-spilling-a-record-amount-of-oil/?noredirect=on&utm_term=.c71b8859cde9.
[5] Lisa Riordan Seville, *Oil Train Derails and Catches Fire in Lynchburg, Virginia*, NBC NEWS (Apr. 30, 2014, 3:34 PM), https://www.nbcnews.com/news/investigations/oil-train-derails-catches-fire-lynchburg-virginia-n93916; *see also U.S. Urges Railroads to Not Use Old Tankers to Haul Volatile Oil*,

environmental hazard at issue in this case, I am concerned that a civil penalty totaling only $2,200,000 is insufficient to deter future oil spills.

Despite this concern, I nonetheless find that the proposed Consent Decree is not unreasonable or inadequate. First, the settlement was negotiated by the Department of Justice on behalf of the EPA—an agency specially equipped and oriented in the field of environmental regulation.[6] Additionally, the $2,200,000 civil penalty reflects the parties' substantial disagreement over the amount of an appropriate penalty. Pls.' Mot. 9.[7] Moreover, district courts should not attempt to "modify the terms of the proposed settlement decree, nor should [they] participate in any bargaining for better terms." *Plummer v. Chem. Bank*, 668 F.2d 654, 655 n.1 (2d Cir. 1982).

In this analysis, the court also considers the two public comments received in response to the proposed Consent Decree. In the first comment [ECF No. 4-1], Mayor Greg Ingram of Montgomery and Mayor D. Anne Cavalier of Smithers request a portion of the civil penalty funds to purchase utility trucks. Mayor Ingram and Mayor Cavalier state that their cities were nearest to the derailment and that they provided essential support in the aftermath of the oil spill. The comment states that both cities

---

CNN (May 8, 2014, 9:37 AM), https://www.cnn.com/2014/05/07/us/railroad-safety-advisory/index.html.
[6] The business of rail transport is heavily regulated by the Federal Railroad Administration. Concerns about rail transport are best left to the bureaucracy.
[7] The parties have considered the CWA penalty factors in determining an appropriate federal civil penalty, which include: (1) the seriousness of the violation; (2) the defendant's economic benefit from violating the CWA; (3) the degree of the defendant's culpability; (4) whether the defendant has received other penalties from the same incident; (5) the defendant's history of past violations; (6) any mitigation that the defendant has carried out; (7) the penalty's economic impact on the defendant; and (8) other matters as justice may require. 33 U.S.C. § 1321(b)(8); *see* Pls.' Mot. 9.

absorbed the extra overtime and costs associated with providing emergency supplies and services. To recover these expenditures, the cities request $250,000 of the civil penalty. The second comment [ECF No. 4-2] is a letter in support of the cities' request from Congressman Alex Mooney.

While both cities used their resources to provide support in responding to the spill, the proposed Consent Decree does not affect the cities' ability to seek reimbursement for those costs. The proposed Consent Decree explicitly states that only the claims in the Complaint are being settled. The cities' outstanding response costs are not part of any claim in the Complaint, and the proposed Consent Decree specifically reserves actions for federal or state claims for unpaid response costs. Proposed Consent Decree 11. For these reasons, the court finds the public comments do not render the proposed Consent Decree unreasonable or inadequate.

### b. The Public Interest

Finally, the court examines whether the settlement is illegal, a product of collusion, or against the public interest.

As an initial matter, no evidence—including the public comments—suggests that the settlement is illegal or a product of collusion. Accordingly, the court's inquiry focuses on whether the proposed Consent Decree is contrary to the public interest.

In making this determination, the court weighs the seriousness of oil-train derailments and their effect on nearby communities. Many railways pass straight through cities and towns. As noted above, oil-train accidents often result in fires and

explosions, threatening the safety of communities. The derailment and oil spill in this case threatened the local water supply, destroyed a home, and affected thousands of people. Yet, the proposed Consent Decree does impose a civil penalty totaling $2,200,000. Moreover, the SEP is expected to positively impact surface water conditions close to the derailment site, and the public comments in no way demonstrate that the proposed Consent Decree is against the public interest. The court finds that the proposed Consent Decree also comports with the goals of the CWA: to eliminate the discharge of pollutants into navigable waters and to provide for water quality sufficient for "the protection and propagation of fish, shellfish, and wildlife and . . . recreation in and on the water." 33 U.S.C. § 1251(a)-(b). As such, the proposed Consent Decree is not against the public interest.

V.   Conclusion

For the foregoing reasons, the court **GRANTS** Plaintiffs' Unopposed Motion to Enter Consent Decree [ECF No. 4]. The court **ORDERS** that the proposed Consent Decree [ECF No. 3-1] be **ENTERED** with the court's approval on this same date. The court further **ORDERS** that this action be, and hereby is **DISMISSED** and **STRICKEN** from the active docket, with the court retaining jurisdiction over this case as set forth in Section XIV of the proposed Consent Decree and any other provision contemplating the potential for future action by the court.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER: January 3, 2019

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE